FILED

JUN 1 2 2023

Clerk, U. S. District Court
Eastern District of Tennessee
At Knoxville

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
### AT KNOXVILLE

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF: ) <br> 8 CELLULAR TELEPHONES, WHICH ) <br> ARE FURTHER DESCRIBED IN ) <br> "ATTACHMENT A" ) | CASE NO. 3:23-MJ-1050 |

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, John Sharp, a Task Force Officer ("TFO") with United States Federal Bureau of Investigation ("FBI"), and being duly sworn, depose and state as follows:

## INTRODUCTION

1.     I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), in that I am empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516.

2.     I have been employed by the Knox County Sheriff's Office since January 2007, I graduated from the Knox County Sheriff's Regional Training Academy in 2009, and I am currently assigned to the United States Federal Bureau of Investigation as a task force officer (TFO) in the Appalachian High Intensity Drug Trafficking Area (AHIDTA). I hold a bachelor's degree in psychology from the University of Tennessee. I have attended over 200 hours of assignment specific training including the investigation and prosecution of narcotics - related offenses, as well as, the writing, planning and execution of narcotics - related search warrants as taught by instructors from the Regional Counter-Drug Taskforce and Streetcop

International. I am currently certified as an Advanced Emergency Medical Technician, and I am a Hazardous Materials operations officer. I have been recognized as a Drug Recognition Expert and have testified as an expert witness, in the 6th Judicial District of Tennessee Criminal Court, Division I, before the Honorable Judge Steven Sword. I have been asked to review evidence of impaired subjects and offer an expert opinion as to their level of impairment, and I have prepared testimony based upon that review. I have also been recognized as an expert witness in the field of narcotics investigations in the 6th Judicial District of Tennessee Criminal Court, Division II, before the Honorable Judge Kyle Hixson. Based on my performance during my 10 years as a patrolman, I was selected by the Knox County Sheriff's Office administration to be a part of the Special Investigations Unit which was tasked with the investigation and prosecution of high profile and large-scale criminal organizations. I have taught more than 25 roll call training sessions involving the identification of various street drugs, civil asset seizure and forfeiture proceedings, impaired driving, drug recognition, DUI, and questions of traffic and criminal law. I have also taught an Introduction to Illegal Drugs class for the Knox County Sheriff's Office Corrections Officers Training Academy.

3.     In addition, I have experience in the investigation of violations of the federal drug and money-laundering laws. As a result, I am familiar with matters including the means and methods used by persons and drug trafficking organizations ("DTOs") to purchase, transport, store, and distribute drugs, and to hide profits generated from those transactions. I also have experience in analyzing and

2

interpreting drug codes and cryptic dialogue used by drug traffickers. In addition, I am also aware that it is common for members of DTOs to possess firearms in furtherance of their drug trafficking activities. In addition, it is also common to use electronic devices such as computers, cellular telephones, and other electronic means to communicate and store information relating to the DTO and the trafficking of drugs.

4.    I have personally participated in the investigation of this case relating to the arrests of the defendants, Ricardo BRIGGS, Kenneth BRIGGS, Paul BRIGGS, and Eric BRADFORD, Sylvester NEAL, and the subsequent seizure of eight (8) cell phones from the aforementioned individuals. All information within this affidavit has been learned from my own personal participation in the investigation.   I am submitting this affidavit in support of an application for a warrant to search the cell phones collected from Ricardo BRIGGS, Kenneth BRIGGS, Paul BRIGGS, and Eric BRADFORD, Sylvester NEAL. The devices I am seeking to search as further described and particularly identified in Attachment A and these will be hereinafter referred to as collectively as "CELL PHONES."

5.    Because this affidavit is being submitted for the limited purpose of establishing probable cause for a search warrant authorizing the search of the CELL PHONES, I have not included every fact known to me concerning this investigation. Instead, I have set forth only the facts that are necessary to establish probable cause to believe that the CELL PHONES contain evidence, fruits, and instrumentalities of

3

violations of Title 21, United States Code, Sections 846, and 841(a)(1), as further described in Attachment B.

## PROBABLE CAUSE

6. In May 2019, investigators with the Knox County Sheriff's Office (KCSO) and the Federal Bureau of Investigation (FBI) began investigating the distribution of illegal drugs involving RICARDO BRIGGS and others, commonly known as the "BRIGGS Drug-Trafficking Organization" (BRIGGS DTO #1).

7. Throughout the investigation, KCSO Detective T. Ballard used a confidential informant to conduct multiple controlled purchases of heroin/fentanyl from the BRIGGS DTO #1.

8. Based on confidential-source reporting, at some point in 2020, the BRIGGS DTO #1 had some internal disagreements amongst its members. The organization then split into two entities. As a result, investigators lost source access to key members within the organization, who reorganized into another DTO.

9. From mid-2022 through February 2023, the Knoxville Police Department (KPD) and the Tennessee Bureau of Investigation (TBI) developed a confidential source that purchased heroin/fentanyl or methamphetamine from the separated entity led by RICARDO BRIGGS (BRIGGS DTO #2).

10. KPD and TBI used a confidential informant to purchase fentanyl and methamphetamine from members of the BRIGGS DTO #2, including SYLVESTER NEAL and RICARDO BRIGGS. In February 2023, for example, investigators purchased at least one ounce (28.3 grams) of suspected

4

methamphetamine and 10.5 grams of fentanyl from SYLVESTER NEAL and seven grams of fentanyl from RICARDO BRIGGS. On the most recent controlled purchase, investigators observed members of the BRIGGS DTO #2 exit 1504 Willoughby Road, enter a vehicle, travel to the meet location, complete the drug deal, then return back to 1504 Willoughby Road.

11.    On February 23, 2023, investigators executed a state search warrant at 1504 Willoughby Road, Knoxville, Tennessee 37920.

12.    As investigators entered the residence, PAUL BRIGGS and KENNETH BRIGGS tried to flee out of a bedroom window but were quickly apprehended. Upon search, a Smith & Wesson 9mm handgun was recovered near the bedroom window, sitting atop an artificial potted plant. Also in the bedroom, investigators recovered nine packages of suspected fentanyl. KENNETH BRIGGS had on his person, an estimated $3,935 in U.S. currency.

13.    The other three individuals, ERIC BRADFORD, RICARDO BRIGGS, and SYLVESTER NEAL were located in a middle bedroom.

14.    A search of the residence revealed the following items:

    (1)    Approximately 1,185 grams of suspected fentanyl in total. The fentanyl was located on the kitchen counter, with a portion being in a blender;

    (2)    Approximately 176 grams of suspected methamphetamine located in a kitchen cabinet;

    (3)    Approximately 143 grams of suspected cocaine in a kitchen cabinet;

    (4)    Approximately $16,863.00 in U.S. currency, including what was recovered from KENNETH BRIGGS;

5

(5)     Smith and Wesson, 9mm handgun;

(6)     One full-face filtration mask;

(7)     One half-face filtration mask;

(8)     Eight Cellular Telephones, located throughout the residence, including one phone on NEAL's person and other on P. BRIGGS' person;

(9)     Drug paraphernalia and packaging; and

(10)    Material used as a "cutting agent."

15.     As part of the recovered suspected fentanyl, approximately 15 one-ounce packages of fentanyl were in plain view on the kitchen counter next to the blender, which contained a large amount of rock fentanyl. It appeared that individuals were cutting (diluting) highly concentrated bulk fentanyl into user-concentration fentanyl. I have learned through my training and experience that drug traffickers commonly user blenders to assist with the dilution of fentanyl. A blender allows the drug trafficker to easily make a homogenous mixture of highly-concentrated fentanyl and the "cutting agent," which is commonly used to dilute highly- concentrated fentanyl into user concentrations. This "cutting agent" is commonly substances such as Diphenhydramine (Benadryl), or a dietary laxative such as Benefiber.

16.     Investigators also recovered particle filtration masks in the kitchen. In my training and experience, these masks are used by drug traffickers in an attempt to prevent themselves from becoming exposed to the drugs while they are diluting high-concentration fentanyl to user-concentration fentanyl.

17.     Based on my training and experience, I know that drug dealers and drug traffickers will often purchase quantities of highly concentrated fentanyl and then use their proprietary cutting agents to dilute the fentanyl and increase the amount of product they have to sell, thereby increasing their profit margin.

18.     Also recovered during the search was various drug paraphernalia used to press large amounts of fentanyl into rock-like substances. Two large "kilo-sized" presses were recovered, scales (commonly used to weigh fentanyl for sale) with powder residue were recovered in the kitchen near the pre-packaged fentanyl. Investigators also found new, unused baggies consistent with the one-ounce packages of fentanyl found in the kitchen.

19.     I, along with another investigator, interviewed RICARDO BRIGGS after his arrest. RICARDO BRIGGS was advised of his *Miranda* rights, and he signed a written form waiving his *Miranda* rights and agreeing to be interviewed by law enforcement. RICARDO BRIGGS admitted to selling fentanyl and stated that he might "chop up 50 grams into 400" for resale, which I know means diluting 50 grams of highly concentrated fentanyl into 400 grams of user-concentration fentanyl.

20.     The recovered fentanyl was tested on the MX-908 mass spectrometer, a test that I and others in law enforcement know is accurate, revealed that the substance was, in fact, Fentanyl.

7

21.     The recovered methamphetamine and cocaine were field-tested by the Thermo- Fisher TruNarc handheld Raman analyzer, a test that I and others in law enforcement know is accurate, revealed that the substances were, in fact, methamphetamine and cocaine.

22.     I know through my training and experience, as well as the modus operandi of the Briggs DTO over the past three years, that drug traffickers utilize multiple phones and multiple phone numbers when conducting drug business such as sales and movement of proceeds from those sales. Drug traffickers do this in an effort to discourage tracking and observation by law enforcement. Also, often time, drug-traffickers will use one cell phone to communicate with street-level dealer who they supply and a 2nd phone to communicate with upper-level members of the organization and/or the ultimate source of supply for the organization. Drug-traffickers do this to keep low-level dealers from learning the traffickers' ultimate source of supply. It also makes it more difficult for law enforcement to analyze phone records and phone communications.

## TECHNICAL TERMS

23.     Based on my training and experience, I use the following technical terms to convey the following meanings:

a.     A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line"

8

telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.      Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic films. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c.      GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations

involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

      d.     PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments, or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data.

Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

Case 3:23-mj-01050-DCP   Document 2   Filed 06/12/23   Page 10 of 23   PageID #: 20

24.     Based on my training, experience, and research, I know that cellular

devices such as the CELL PHONES, even flip phones, may have capabilities that

frequently include acting as a wireless telephone, digital camera, GPS navigation

device, and PDA. In my training and experience, examining data stored on devices

of this type can uncover, among other things, evidence that reveals or suggests who

possessed or used the device, evidence of a crime, or point toward the existence of

evidence in other locations. This data can be evidence of a crime, indicate the

identity of the user of the digital device, or point toward the existence of evidence in

other locations.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

25.     Based on my knowledge, training, and experience, I know that

electronic devices can store information for long periods of time. Similarly, things

that have been viewed via the Internet are typically stored for some period of time

on the device. This information can sometimes be recovered with forensics tools.

26.     *Forensic evidence.* As further described in Attachment B, this

application seeks permission to locate not only electronically stored information

that might serve as direct evidence of the crimes described on the warrant, but also

forensic evidence that establishes how the particular cell phone was used, the

purpose of their use, who used them, and when. There is probable cause to believe

that this forensic electronic evidence might be on the particular CELL PHONES

described because:

a.      Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b.      Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.      A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.      The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.      Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

12

f.      Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

g.      The nature of cellular phone-related evidence requires forensic analysts to employ a variety of different techniques to search for, document, and obtain electronic evidence. The search procedure may include the following techniques (the following is a nonexclusive list, as other search procedures may be used):

   i. examination of all of the data contained in the cellular telephone, and/or memory storage devices in the cellular telephone to view the data and determine whether that data falls within the items to be seized as set forth herein;

   ii. searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth herein;

   iii. surveying various file directories and the individual files they contain;

   iv. opening files in order to determine their contents;

   v. scanning storage areas; and

   vi. performing keyword searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are likely to appear.

27.     Because this warrant seeks permission to examine only the CELL PHONES, which are already in law enforcement's possession, the execution of this

warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

**CONCLUSION**

28.     In light of the foregoing, there is probable cause to search the CELL PHONES, as set forth in Attachment A, for evidence of drug trafficking in violation of Title 21, United States Code, Sections 846 and 841(a)(1).

Respectfully submitted,

John Sharp
FBI Task Force Officer

Subscribed and sworn to before me on this 13th day of April 2023.

DEBRA C. POPLIN
UNITED STATES MAGISTRATE JUDGE

# ATTACHMENT A

### Cell Phone #1

A black Apple iPhone with three cameras on the back recovered from a brown table in Room A by Special Agent Neal Baldwin during the execution of a Search Warrant at 1504 Willoughby Road in Knoxville, Tennessee on February 23, 2023 (Tennessee Bureau of Investigation Custody)



**Cell Phone #2**

A purple Motorola smartphone in purple case recovered from the floor of Room D by Special Agent Hunter Snoderly during the execution of a Search Warrant at 1504 Willoughby Road in Knoxville, Tennessee on February 23, 2023 (Tennessee Bureau of Investigation Custody)



**Cell Phone #3**
A black Apple iPhone in a black and orange case atop a dresser in Room D by Special Agent
Hunter Snoderly during the execution of a Search Warrant at 1504 Willoughby Road in
Knoxville, Tennessee February 23, 2023 (Tennessee Bureau of Investigation Custody)



**Cell Phone #4**

A black Samsung smartphone recovered from a black duffel bag in Room B by Investigator
Michael Booker during the execution of a Search Warrant at 1504 Willoughby Road in
Knoxville, Tennessee on February 23, 2023 (Tennessee Bureau of Investigation Custody)



**Cell Phone #5**

A black Apple iPhone with a cracked screen recovered from the couch in Room B by Investigator Michael Booker during the execution of a Search Warrant at 1504 Willoughby Road in Knoxville, Tennessee on February 23, 2023 (Tennessee Bureau of Investigation Custody)



**Cell Phone #6**

A black Apple iPhone in a black case recovered from the sink of Room C by Investigator
Michael Booker during the execution of a Search Warrant at 1504 Willoughby Road in
Knoxville, Tennessee on February 23, 2023 (Tennessee Bureau of Investigation Custody)



**Cell Phone #7**

A black Samsung cellular telephone recovered from SYLVESTER NEAL, III's person by Special Agent Jim Makemson during the execution of a Search Warrant at 1504 Willoughby Road in Knoxville, Tennessee on February 23, 2023 (Tennessee Bureau of Investigation Custody)



**Cell Phone #8**

A blue Apple iPhone with three cameras on the back – in a case - recovered from the right front pocket of PAUL BRIGGS by Investigator Austin Jordan during the execution of a Search Warrant at 1504 Willoughby Road in Knoxville, Tennessee on February 23, 2023 (Tennessee Bureau of Investigation Custody)



**ATTACHMENT B**

1. All records on CELL PHONES 1 - 8 described in Attachment A that relate to violations of Title 21, United States Code, Sections 841(a) (1) and 846 as follows:

   a. All communications between, in whatever form, that relate to, further in any way, or constitute evidence of drug trafficking, including all records related to those communications.

   b. All photographs, videos, audio recordings, and text messages that relate to, further in any way, or constitute evidence of drug trafficking.

   c. All data, communications, information, and records, in whatever form, that have any tendency to establish the physical location of the particular CELL PHONE.

   d. All data, communications, information, and records, in whatever form, that establish the identity or location of individuals engaged in drug trafficking.

2. Evidence of user attribution showing who used or owned the particular CELL PHONE at the time the electronically stored evidence described in this warrant was created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored.